# EXHIBIT A

ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
**MILBERG, PLLC**
280 South Beverly Drive, PH
Beverly Hills, CA 90212
Tel: (872) 365-7060

Trenton R. Kashima (SBN 291405)
tkashima@brysonpllc.com
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Tel: (212) 946-9389

*Attorneys for Plaintiffs and the Class*

ELECTRONICALLY FILED
**Superior Court of California**
**County of Sonoma**
**2/13/2026 8:11 AM**
**By: Tyler Guyot, Deputy Clerk**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SONOMA

| | |
|---|---|
| JOHN BERDNER and JEFF DOMICH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DRAGONFLY ENERGY HOLDINGS CORP. D/B/A BATTLE BORN, a Nevada Corporation,<br><br>Defendant. | Case No.:     & 9<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs John Berdner and Jeff Domich ("Plaintiffs"), by and through their attorneys, bring this action against Dragonfly Energy Holdings Corp. ("Defendant" or "Battle Born"). Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by counsel as to all other allegations:

### INTRODUCTION

1.      Plaintiffs bring this class action against Defendant regarding its "Battle Born" branded 100 amp-hour lithium batteries (the "Products").[1] The Products have a uniform dangerous design defect (the "Defect"). The Defect poses a serious fire hazard and safety risk. It also causes premature and sudden battery failure.

2.      Specifically, the Products' positive (+) battery terminal (bolted into place with nuts) becomes loose with ordinary use, causing the positive battery terminal and battery cells to overheat to temperatures of 250 degrees Fahrenheit while recharging, plus sudden and premature battery failure.



---

[1] The Products at issue are Battle Born's 100 amp-hour lithium batteries, including without limitation: 100Ah 12V LiFePO4 Deep Cycle Battery (model # BB10012), 100Ah 12V GC2 LiFePO4 Deep Cycle Battery (model # BBGC2), 100Ah 12V LiFePO4 Heated Battery Kit (model # BB10012H-1KIT), 100Ah 12V Smart LiFePO4 Deep Cycle Battery (model # BB10012i), 100Ah 12V Smart Heated LiFePO4 Deep Cycle Battery Kit (model # BB10012iH-1KIT), 100Ah 12V GC2 Smart LiFePO4 Deep Cycle Battery (model #BBGC2i), 100Ah 12V GC2 LiFePO4 Heated Battery Kit (model # BBGC2H-1KIT), and 100Ah 12V GC2 Smart Heated LiFePO4 Deep Cycle Battery Kit (model # BBGC2iH-1KIT). These batteries typically retail for between $800-$1,000. Plaintiffs reserve the right to amend this Complaint to include all other similarly situated products and equivalent model variants.



Loose Positive Battery Terminal     Loose Bolt and Nuts          Melted Plastic Spacer    Busbar

[Images dated December 9, 2025][2]

---

[2] https://www.youtube.com/watch?v=XP2yPY57Wjc&t.

3. In other words, by design, the positive battery terminal is secured with a bolt and nuts, and pushes against a plastic spacer on the inside of the busbar.[3] The presence of the plastic spacer prevents direct contact between the busbar and the terminal. The positive battery terminal easily becomes loose with ordinary use—for example, in a scenario where vibration occurs like in an RV or boat. When that happens, instead of the busbar safety conducting electric current (its intended purpose), the bolt itself conducts current—which is unsafe and causes "arcing"[4]—because the loose positive terminal post does not directly contact the busbar.

4. The Products' design includes plastic in between two conductive elements (i.e., stainless steel bolt and copper busbar). When the bolt becomes hot during charging, the adjacent plastic melts and softens, which means the pressure holding the busbar together is reduced, which in turn increases resistance, and therefore causes more heating. The design of the positive current path leads to dangerous overheating and battery failure.

5. Defendant intentionally marketed and sold the Products as "safe, reliable, and long-lasting"[5] and fit for their intended purpose, yet failed to disclose the Products posed an unreasonable safety and fire risk due to the Defect. On information and belief, Defendant has been aware of the Defect for years—including through reports from consumers and intentionally designing the Products in this manner.

6. To date, Defendant has not initiated any recall of the Products, despite the Defect and consumer reports. Instead, in response to questions from concerned users, Defendant denies the Defect and states that the Products—which overheat and are at risk of fire—are working as designed.

7. Indeed, despite reported incidents dating back to 2020 (and likely years earlier), Defendant failed to issue any warning or make design changes to remedy the Defect and continued profiting from its sales throughout the United States.

---

[3] A busbar is "an electrical conductor, maintained at a specific voltage and capable of carrying a high current, usually used to make a common connection between several circuits in a system." See https://www.dictionary.com/browse/busbar.

[4] "Arcing" is a dangerous, unintended, and intense discharge of electricity bridging a gap between conductors. See https://www.firetrace.com/fire-protection-blog/arcing-the-leading-cause-of-electrical-fires.

[5] https://battlebornbatteries.com/shop/products/batteries/base-series-lifepo4-batteries/

8.     The Defect existed at the point of purchase. Due to Defendant's marketing of the Products, along with Defendant's failure to disclose to consumers at the time of purchase that the Products contained the Defect, Plaintiffs and class members trusted Defendant and its representations that the Products were safe to use as intended and paid a premium for that important quality. Additionally, the Defect in the Products persist, rendering them unfit and worth less than advertised and warranted.

9.     The Defect is a material fact that reasonable consumers, including Plaintiffs and class members, would have considered when deciding whether to purchase the Products. Before purchasing the Products, Plaintiffs and class members did not know the Products had the Defect and that using the Products for their intended and foreseeable purpose, under ordinary conditions, would place them at risk of harm due related to the fire and safety risk.

10.    Defendant was able to charge a premium price for the Products due to its marketing and failure to disclose the Defect. Defendant knew that safety, longevity, and suitability of the Products for ordinary use (which naturally includes structural integrity and absence of fire risk) are paramount to consumers.

11.    Indeed, the Products are regularly used to power RVs and boats in remote areas with no alternative power sources. If the Products suddenly fail or cause fire, consumers could be left stranded in remote areas with no recourse. This is extremely dangerous.

12.    No reasonable consumer would have purchased the Products on the same terms or conditions if they knew of the Defect. Defendant chose to put consumers' safety at risk to sell more Products and opted for decisions that put profit over people. Defendant has not provided a meaningful remedy to consumers, including Plaintiffs and class members.

13.    Had Plaintiffs and class members known about the Defect at the time of purchase and the associated risks caused by the Defect, they would not have purchased the Products or at minimum would have paid much less for them.  By selling a dangerously defective product, Defendant violated the Uniform Commercial Code's (UCC) warranty provisions and consumer protection statutes. Plaintiffs and class members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek monetary relief, including

restitution, compensatory damages, and statutory damages, as appropriate against Defendant.

14. Plaintiffs, on behalf of themselves and class members, seek damages and all other relief available under law and equity from Defendant, including injunctive relief. Plaintiffs also seek: (i) an adequate notice program for dissemination of a recall notice; (ii) a corrective advertising campaign to alert consumers to the dangers of the Defect; (iii) an offer to replace the Products with a reasonable and safe product; and/or (iv) a full refund for the purchase price of the Products.

## JURISDICTION AND VENUE

15. This is a class action lawsuit brought pursuant to Code of Civil Procedure § 382, and this Court has jurisdiction over Plaintiffs' and the class's claims because the amount in controversy exceeds this Court's jurisdictional minimum.

16. This Court has subject matter jurisdiction pursuant to Article 6, § 10 of the California Constitution, California Business & Professions Code § 17203, Civil Code § 1780(d), and Code of Civil Procedure §§ 382 and 410.10.

17. This Court has personal jurisdiction over Defendant because it conducts substantial business within California. Defendant advertises and sells the Products to prospective customers in this State. Defendant distributed the Products to California consumers. This includes distribution through Defendant's website and third-party retailers, with the Products sold to California consumers. Defendant marketed the Products on the internet, and Defendant expected and knew that California consumers would purchase some of those Products in the state of California. Thus, a substantial portion of the events giving rise to the claims alleged here occurred in this State.

18. Venue is appropriate pursuant to Code of Civil Procedure §§ 395 and 395.5 because a substantial part of the conduct giving rise to at least one Plaintiff's claims occurred in this District, as Defendant regularly transacts business in this County, and Defendant intentionally availed itself of the laws and markets within this County. Venue is also proper because at least one Plaintiff is a resident and citizen of this County.

## PARTIES

### A.    Plaintiff Jeff Domich

19.    Plaintiff Domich is a citizen of the State of California and a resident of Sonoma County.

20.    Plaintiff Domich purchased five Battle Born 100Ah 12V LiFePO4 Deep Cycle Batteries (model # BB10012). Two batteries were purchased from BattleBornBatteries.com on March 15, 2023, and one battery was purchased from BattleBornBatteries.com on March 24, 2023. The batteries were ordered by and delivered to Plaintiff Domich in Sonoma County, California. The remaining two batteries were purchased from third-party retailers.

21.    Plaintiff Domich used the batteries to power his RV. He has not used the batteries for more than 3000 to 5000 cycles.

22.    The batteries were installed in a secure, dry location using proper sized wiring installed in accordance with the manufacturer's recommended torque specifications.

23.    Of the five batteries he purchased, three previously failed and were replaced under warranty by Defendant. On information and belief, these batteries failed because of the Defect. Indeed, the battery terminals were discolored, which is indicative of overheating. However, all batteries, including the replacement batteries, still have the Defect because the Defect is inherent in the design of all Products.

24.    Prior to purchasing the Products, he viewed the advertising and product specifications on the BattleBornBatteries.com product webpage and homepage discussed herein. Based on archived copies of the website, he saw the Products were generally advertised as, among other things:

   a.    Capable of proving "100 Amps Continuous" current;

   b.    "Our 100 amp hour, 12 volt battery weighs only 31 pounds and is capable of providing you power and relief from battery anxiety";

   c.    "Our 100 Ah 12 V LiFePO4 Deep Cycle battery has a life expectancy of 3000-5000 cycles* with a 100 Amp Continuous current, 200 Amp Surge Current (30 seconds), and ½ second surge for higher loads"; and

   d.    "*Approximately 75-80% of the battery capacity will remain after 3000 cycles in applications recharging at 0.5C or lower. We have seen life spans of well

over 5000 cycles in our lab testing.*"

25. Based on archived copies of the website, he also saw the BattleBornBatteries.com homepage generally stating: "Revolutionary, reliable green energy, we're Battle Born Batteries. Specializing in providing industry-leading lithium iron phosphate batteries, our LiFePO4 batteries are recognized for their reliability, chemical stability, and advanced technology."

26. Plaintiff Domich thus believed the Products would last at least 3000 to 5000 cycles without issue, would safely function as a lithium battery, and were not at risk of overheating, fire, or sudden premature failure under ordinary and intended use. Plaintiff Domich also believed the Battle Born-branded batteries were premium and high-quality goods, and supposedly worth the premium price charged.

27. There were no warnings about the Defect on the Products' packaging, at the point of purchase, or conspicuously presented to Plaintiff Domich before purchase.

28. Had Plaintiff Domich known about the Defect, he would not have purchased the Products or, at minimum, would have paid much less for them. As such, Plaintiff Domich paid a premium price for the Products.

29. Plaintiff Domich continues to be interested in purchasing and using 100 amp-hour lithium batteries similar to the Products. However, he will be unable to trust and rely on Defendant's advertising and the Products' design, so he will not purchase the Products from Defendant.

**B.    Plaintiff John Berdner**

30. Plaintiff Berdner is a citizen of the State of California and a resident of Grass Valley in Nevada County, California.

31. Plaintiff Berdner purchased a Battle Born 100Ah 12V GC2 LiFePO4 Heated Battery Kit (model # BBGC2H-1KIT) from BattleBornBatteries.com in or about July or August 2022. The battery was ordered by and delivered to Plaintiff Berdner in Nevada County, California.

32. Plaintiff Berdner used the battery to power his motor home. He has not used the batteries for more than 3000 to 5000 cycles.

33. On information and belief, his battery has the Defect because the Defect is inherent in the design of all Products.

34.     Prior to purchasing the Product, he viewed the advertising and product specifications on the BattleBornBatteries.com product webpage and homepage discussed herein. Based on archived copies of the website, he saw the Products were generally advertised as, among other things:

    a.  Life expectancy of at least "3000-5000 Cycles"; and

    b.  "The 100Ah 12V GC2 deep cycle LiFePO4 battery uses a proprietary, low draw technology to keep your battery warm and ready to charge no matter what weather you may face. The stable chemistry and built-in battery management system help provide you with safe and reliable power on your adventures. Our batteries are also backed by a 10 year warranty to make your battery anxiety a thing of the past!"

35.     Based on archived copies of the website, he also saw the BattleBornBatteries.com homepage generally stating: "Revolutionary, reliable green energy, we're Battle Born Batteries. Specializing in providing industry-leading lithium iron phosphate batteries, our LiFePO4 batteries are recognized for their reliability, chemical stability, and advanced technology."

36.     Plaintiff Berdner thus believed the Products would last at least 3000 to 5000 cycles without issue, would safely function as a lithium battery, and were not at risk of overheating, fire, or sudden premature failure under ordinary and intended use. Plaintiff Berdner also believed the Battle Born-branded batteries were premium and high-quality goods, and supposedly worth the premium price charged.

37.     There were no warnings about the Defect on the Products' packaging, at the point of purchase, or conspicuously presented to Plaintiff Berdner before purchase.

38.     Had Plaintiff Berdner known about the Defect, he would not have purchased the Product or, at minimum, would have paid much less for it. As such, Plaintiff Berdner paid a premium price for the Product.

39.     Plaintiff Berdner continues to be interested in purchasing and using 100 amp-hour lithium batteries similar to the Products. However, he will be unable to trust and rely on Defendant's advertising and the Products' design, so he will not purchase the Products from Defendant.

C.    **Defendant Dragonfly Energy Holdings Corp.**

40.    Defendant Dragonfly Energy Holdings Corp. d/b/a Battle Born is a Nevada corporation with its principal place of business in Reno, Nevada.

41.    Defendant designed, produced, marketed, and sold the Products at issue, and is responsible for the past and current marketing and advertising campaign regarding the Products.

42.    On information and belief, Dragonfly operated under the trade name "Battle Born" and manufactured, distributed, retailed, and warranted the Products in the United States during the relevant time period.

## FACTUAL ALLEGATIONS

A.    **Defendant Knowingly Placed Defective Batteries on the Market**

43.    At all times relevant to the issues alleged in this Complaint, Defendant engaged in the business of designing, manufacturing, marketing, labeling, distributing, selling and/or introducing into interstate commerce the "Battle Born" branded lithium batteries, including the Products.

44.    Lithium iron phosphate (LiFePO4) batteries have largely replaced lead-acid batteries in RV, solar, and marine systems because they are lighter, charge faster, tolerate deep discharge, and provide far more usable capacity. Lead-acid units were historically the standard and remain common in starter and backup applications, but they are bulky, degrade quickly under cycling, and rarely match lithium performance. In this context, the practical difference is that lithium's higher energy density and internal electronics create failure modes, including thermal events, that traditional lead-acid batteries almost never exhibit.[6]

45.    The Products are used for powering and charging an array of backup power systems, including RVs, boats, motor homes, and other vehicles and electronics.

46.    Defendant currently advertises the Products as being "safe, reliable, and long-lasting" compared to traditional lead-acid batteries, and "maintenance-free":

> Are you ready to … **Get Out There. Stay Out There**? Make the switch from heavy lead-acid batteries to safe, reliable, and long-lasting LiFePO4 batteries and, in turn, upgrade your lifestyle and ability to adventure. Browse our full line of lithium-ion batteries for sale today and experience the power of Battle Born!

---

[6]https://battlebornbatteries.com/lead-acid-batteries-lithium-marine-sector/?srsltid=AfmBOooNCvSs9AW1ZB2-EKn4Eadze9G_I-1cV0pCOYLGsu7i-dp82IhY

*Battle Born Batteries Marketing Page*[7]



## 100Ah 12V LiFePO4 Deep Cycle Battery

~~$949.00~~ **$799.00**



| 1 | **ADD TO CART** |

🔋 0% APR or as low as $67/mo. See what you can spend with *affirm*.

Military or First Responder? Get Discount

BB10012

Looking for a powerful and long-lasting lithium battery for your RV, boat, or off-grid system? The Battle Born 100Ah 12V LiFePO4 Deep Cycle Battery is the ultimate drop-in replacement for Group 31 and Group 27 batteries. As Battle Born Batteries' flagship model, this 100 amp hour lithium battery delivers superior and long-lasting performance and is engineered with lithium iron phosphate (LiFePO4) technology! It's time to upgrade your power system with a lightweight and safe solution ideal for various systems.



- **100Ah Capacity with Deep Discharge** for a full 100 amp-hour lithium battery (12V) with 100% usable power
- **Drop-In Replacement** for Group 27 & Group 31 batteries
- **Designed for Versatility** with the ability to be wired in series or parallel and mounted in any orientation
- **Safe & Maintenance-Free** lithium iron phosphate (LiFePO4) battery chemistry ensures long-term stability
- **Rugged Battery Design** built for RV, camper van, boat, trolling motor, industrial, off-grid, and residential backup applications
- **Lightweight & Durable** weighing only 31 pounds for 100Ah of usable power power
- **Long-Lasting** with 3,000-5,000 deep discharge cycles providing up to 10-15 years of power
- **Built-In Battery Management System** for advanced BMS protection, featuring low

*100Ah 12V LiFePO4 Deep Cycle Battery ListingPage.*[8]

---

[7] https://battlebornbatteries.com/shop/products/batteries/base-series-lifepo4-batteries/

[8] https://battlebornbatteries.com/product/12v-lifepo4-deep-cycle-battery/

47.     Defendant authored and/or approved the information that appeared in the Products' specifications sheet and on labels, packaging, and point-of-sale advertising.

48.     The Products were sold nationwide at retail for approximately $800 to $1,000 each[9], a premium price for a supposed premium product. Other 100 amp-hour lithium are available in the marketplace for less.

49.     Recent online complaints and investigations have reported severe overheating of Battle Born's battery Products, posing both a serious risk of sudden and premature failure in the machinery in which they are installed, as well as posing a standalone fire and safety hazard.

50.     On information and belief, consumers were reporting the Defect online and directly to Defendant (specifically the overheating battery terminals with loose connectors as the primary root cause) for years:



*DIY solar forum blog post*[10]

_____

[9] *Id.*

[10] https://diysolarforum.com/threads/battle-born-victorious.64848/



*DIY solar forum blog post*[11]

51.    Indeed, the issue has become so widespread that on December 9, 2025, a popular off-grid solar power YouTube creator with over 1 million subscribers, posted a video describing the Defect in detail. He diagnosed the problem as the Product's terminal being connected with bolts and nuts that become loose, causing the battery to overheat to temperatures of over 250 degrees Fahrenheit while recharging—as well as causing random shutdowns and overheating the cells and bending the plastic case around the terminal.[12]

52.    Consumers who faced the same Defect commented on the video providing their

---

[11] https://diysolarforum.com/threads/battleborn-four-bb10012-battery-bank-failure.67472/
[12] https://www.youtube.com/watch?v=XP2yPY57Wjc&t

experience with the Products—including a user notified Defendant of the Defect in 2019:

RVPrepperWayne - 12/9/2025:

"Will, I had 4 of them that I took apart with the same issue. All of them had the same date code and all had issues with the same thing. I filmed it and will post it in a few days and send you a link. I called them and spoke with them about this. I was told that there was no other issue was reported and there was no issue with them. I told them they all had the same date code so there must be a quality control issue at that time. This was 2 years ago I spoke with them. They flat out denied of there being an issue. Now I see this and I call BS on them for stating there was no issue. Ill send you a link to my video as soon as I get it up. I just thought you should know. Wayne"

Nomadic_Kokpelli - 12/09/2025:

"Hey Will. I have been TELLING people about this issue since 2019. I brought it up DIRECTLY with 2 of their highest Ambassadors, SV DELOS and another sailing channel who asked not to be named ,, and I got an EMAIL from BB claiming the owners must have ABUSED their batteries if they were having issues. There should be a FULL RECALL on ALL this 100ah Build units from 2018-2021. If ANYONE owns one from this time period and same " series " they need to contact Battle Born and Demand a replacement !! I am sure there will be a ' Pro-Rated ' fee and the owners required to return the DEFECTIVE units at their own expense. I never had one to open like you did , BUT saw this issue in Nov. 2019 when installing a Micro A/C system on a 28ft Sailboat. ALL FOUR of the 100ah Battle Born units were showing a radiant heat temperature on the Positive Terminal of 104* to 126* Fahrenheit while under even moderate loads. I am So Glad this has finally been brought to light , 💡 LITERALLY. Another reason I love batteries that can be Opened by Consumers with Screws to see the inner components should anything weird be happening with your cell. IMHO , I have always said BB is just another Chinese Cell Battery with Chinese BMS and some USA Made Stickers on it. Same as Dakota Lithium. It annoys me when people claim " My Battery is American Made " but you cannot argue with people who are not knowledgeable enough to understand Thanks Will. You are Blessed Brother !!!!"

53.    On January 8, 2026, the YouTube creator posted another video showing how a brand-new Product he just purchased, while following the recommended specs of use and connectors, suffered from the Defect.[13] The battery terminal connectors had become loose, the plastic case had deformed, and the Product was showing signs of discoloration due to the high temperatures after only 30 cycles of use.

54.    On January 30, 2026, the YouTube creator posted another video opening a number of

---

[13] https://youtu.be/2m7DSCKO-Bo?si=UND8zoieeeNYGl4X

used Products he collected, and all showed signs of loose connectors to the terminal.[14] Many of the batteries also showed discoloration and bending of the plastic case, a clear sign of unreasonably dangerous high temperatures. On information and belief, Defendant is aware of the YouTube creator's videos and tests. Many consumers commented under this video to complain about their negative experiences with the Products and the same Defect—including one user who was threatened with legal action by Defendant, and others who claim Defendant ignored their reports of the Defect.



@SailingSophisticatedLady 6 days ago

I found this exact problem over 3 years ago when I had a full system of Battleborn Batteries.. I reported to them and they ignored it until later when I had other people going after them for warranty of same batteries and they threatened me with legal action.. i never had a problem with them in 3 years before that, but after opening 7-8 of the batteries and finding issues with most of them, they were not happy that i might tell anyone.. i told my friends but never did put it in a video because I didn't want a company with a big legal team coming after me.. in my mind there is something about how this company stays in business that just doesn't make sense to me…

@djbirdwell3354 6 days ago

Same problem here they ignore my problem

@srupp9271 4 days ago

I had the same problem. I think there should be a lawsuit against this company.

👍 1  👎      Reply

@nickjito 6 days ago

The amount of people that bought these batteries (expensively) under the premise they were they best or the gold standard must be infuriated.

@parkerscott859 5 days ago

I inherited a setup from a travel trailer I purchased with a 6-battery Battle Born array on it…. at this point, 4/6 batteries have completely failed. 2/4 showed thermal issues (blown-up top and discoloration at the positive terminal). The other two can't take charge on the bench and can't be drawn down, as they immediately enter lockout. I contacted BB Warranty, and they absolutely did not in any way, shape, or form…

Read more

👍 11  👎    Reply

---

[14] https://youtu.be/DUtbnbLpvFk?si=hA41Eg0P-dXIYDfc



**@retrozmachine1189** 6 days ago

That they continued to produce & sell batteries with this design well after the point where there's no denying they knew about the issue is unforgivable.

👍 18  👎    Reply



**@mikelefate1621** 5 days ago

Hey Will! I have two of these that I bought back in 2020. I replaced them a few years ago because they failed, and I never went through the warranty process because it is such a pain.  We full time travel around the country, can I drop the batteries off somewhere for you? We have zero use for them and don't want to give them away because they are dangerous.

👍 3  👎    Reply



**@GrandAdventure** 6 days ago

Pretty much the complete cavalcade of issues exhibited in our Battle Born 6 x 100 Ah battery bank that we just YouTubed: batteries you couldn't wake up, batteries that immediately shut down upon applying any load, etc. Only two out of six were actually functional.  For us, however, our biggest gripe was their warranty procedure that essentially made it impractical to file a warranty claim. $4,800 down the drain.

Will, many of our video commenters suggested that we should have somehow gotten them to you for testing. I apologize that we didn't, but it looks like you've got a whole pallet of them there to report on.

Show less

👍  👎    Reply



**@Willdesignsandbuilds** 6 days ago (edited)

After reading through the comments and responses to my findings and seeing other videos from owners with smaller channels that had failures, watching your findings and continued investigations and reading the comments, and reading through many forum posts, etc.., it's clear there is a pattern of failure and that these issues have been going on for some time.

Sadly most failures have been quietly disposed of without the greater community knowing or realizing, wit many likely being chalked up as isolated cases, but now that the discussion is mainstream and it has beer documented exactly what's going on inside, the discovery and discussion has brought to light the numerous first hand negative experiences users have had with the product with regard to failures and warranty support.

Most use applications will require a period of time before problems might develop, and as you pointed out if you have a large bank in parallel, you might not realize problems have already developed.

Show less

**@akhtarkh** 4 days ago

2:36 the bus bar is copper, the positive terminal is copper. But they are not connected directly. The current passes through the steel bolt with clearence holes to go from bud bar to external terminal. On top of that, they have put a plastic spacer. The steel bolt will definitely over heat causing the plastic spacer to melt and making the whole contraption very dangerous. It looks like a first design of an elementary grade student.

👍  👎    Reply



55.    The examples listed above are illustrative and do not represent the universe of complaints that Defendant received. Defendant's records of the Products' warranty claims and complaints would have identified the Defect years ago, and yet Defendant did nothing.

56.    Worse, users also complained that Defendant deletes and blocks comments about the Detect posted to Defendant's social media pages.

57.    Defendant manufactured and sold the Products as long-lasting lithium batteries, and implied that they were suitable for that purpose. However, Defendant failed to disclose that the Products were defective, specifically having loose terminal connectors on the battery, causing the battery to overheat, posing an unreasonable risk of serious injury or fire, and sudden failure. The risk associated with the Products at issue was beyond any reasonable or nominal risk that might be associated with lithium batteries generally.

58.    Defendant made partial representations to Plaintiff and class members, while

suppressing the Defect. By advertising the Products' expected performance, Defendant implied that the Products were suitable and reasonably safe to use as lithium batteries, all without disclosing that they had a critical safety-related design Defect.

59. Plaintiffs and class members would not have bought the Products, or at minimum would not have bought them on the same terms, if the Defect had been disclosed. Indeed, consumers have options when purchasing batteries and would not have purchased a product that unreasonably risks fire and injury based on the Defect.

60. At the time of purchase, Plaintiffs and class members did not know, and did not have reason to know, that the Products were defective based on the Defect. Defendant had exclusive knowledge of that fact. Indeed, the only way to discover the Defect was by conducting the type of destructive testing that would not be normally within a consumer's knowledge and capabilities. Additionally, such testing could only occur after the Products were purchased, making it impossible for consumers to discover the Defect before purchasing the Products.

61. Indeed, Defendant is aware of the dangers associated with the Defect and its Products as evidenced in the multiple consumer complaints, forum post and YouTube videos as well as its own internal warranty and complaint records. Additionally, Defendant designed and manufactures the Products, and was therefore aware of the Defect resulting from its efforts.

62. Defendant knew about the Defect through normal quality assurance inspection and testing. Pursuant to applicable industry standards, a lithium battery sold for consumer use should not be constructed in such a way that it overheats, and prematurely and suddenly fails, through normal use.

63. Defendant neither disclosed the Defect nor issued pre-sale or post-sale warnings to consumers that the Products' loose terminal connections was causing the battery to overheat, thus posing an unreasonable risk of serious injury, fire, and sudden failure.

64. Despite having the capability and expertise to identify and mitigate the Defect, Defendant failed to redesign the Products, recall the Products, or issue sufficient consumer warnings, for years. This delay contributed to the continued availability of defective Products and the repeated harm caused. Defendant prioritized profit over the integrity and safety of the Products and pushed the

Products into the marketplace with the Defect.

65. Consumers reasonably relied on Defendant's representations that the Products were safe and able to be used for their intended purpose, and included basic safety features that an ordinary consumer would expect to accompany any consumer lithium battery. Defendant misrepresented, concealed and otherwise omitted material facts that would have been important to Plaintiff and class members in deciding whether to purchase the Products. Defendant intended to, and did, deceive reasonable consumers, including Plaintiff and class members.

66. Defendant's representations and omissions are material in that a reasonable person would attach importance to them. Again, the Defect: (a) can cause serious injury; and (b) renders the Products unsuitable for their primary function as safe and reliable lithium batteries that can be used in long-term, unsupervised applications (like RV, solar, and marine systems).

67. Plaintiffs and class members paid for the Products but did not receive the full value as advertised and warranted due to Defendant's misrepresentations and omissions. Had Plaintiffs and class members known the truth about the Products, *i.e.*, that they had a serious safety-related design Defect, Plaintiffs and class members would not have purchased them at the price at which they bought the Products. Consequently, Plaintiffs and class members suffered injury in fact and lost money because of Defendant's wrongful conduct.

**B.    The Unconscionability and Failure of Essential Purpose of The Warranties**

68. Defendant expressly warranted, via Owner's Manuals, advertisements, and specification sheets, that the Products are fit for the ordinary purpose for which they are sold.  At the point of sale, Defendant also warrants that the Products are safe and durable, and would last at least 3000 to 5000 cycles under ordinary use.

69. Defendant intended its warranties to apply directly to these consumers who depend on Defendant to provide safe and durable Products. Defendant manifests intent that its warranties apply to Plaintiffs and class members as third-party beneficiaries is evident from the statements in its product literature, which begins on the date of the consumers' purchase is shipped.

70. However, despite these warranties, as described herein, the Products contain a uniform design Defect prior to and at the time of purchase, causing them to commonly and consistently fail in

their primary purpose.  Defendant knew, or should have known, of the Defect and dangers posed in its Products prior to and at the time of sale of the Products to consumers. Plaintiff and class members, on the other hand, had no way of knowing of the Defect or the dangers presented by the Products prior to purchase.

71.    Any supposed limitations on warranties imposed by Defendant are collectively and individually the result of surprise and oppression and are so one-sided and overly harsh that they are both procedurally and substantively unconscionable.

72.    Defendant knew of the Defect in its Products prior to and at the time of sale, including from its design of the Products, knowledge of industry safety guidance and recommendations, as well as from warranty claims made directly to Defendant.  Defendant was in a superior position to know of, remedy, and disclose the Defect in its Products to Plaintiff and class members, who could not have known of their defective nature at the time of purchase. There was a substantial disparity between the parties' bargaining power between Plaintiffs and Defendant. A disparity existed because Defendant was aware that the Products were defective, while Plaintiffs and class members had no notice or ability to detect said Defect, and had no reason to believe such a Defect existed due to Defendant's marketing.

73.    Defendant knew Plaintiffs and class members had no notice or ability to detect the Products' uniform Defect, and Defendant knew that Plaintiff and class members would bear the cost of remedying or replacing the Products.

74.    Defendant knew of the Defect at the time of sale, while Plaintiffs and class members had no ability to discover the Defect at the time of sale.

75.    Defendant was in breach of the warranties at the time Plaintiffs and Class members purchased the Products because they were defective when they came off the assembly line. Thus, at the time the defective Products were sold to consumers, Defendant was already in violation of its warranties.

76.    Defendant sold the Products knowing they were not capable of being repaired or replaced with a non-defective version of the same Products.

77.    Plaintiffs and class members would have negotiated better terms in the purchase of the Products had they been aware of the Defect.

78. Any limitations in the terms of express warranties unreasonably favor Defendant over Plaintiffs and class members.

79. In addition, the express warranties failed in their essential purpose in that: (1) the Defect existed at the time the Products left the manufacturing facility; and (2) Defendant failed to disclose its knowledge of the Defect at any time and even when contacted by customers about the Products.

80. Accordingly, recovery by Plaintiffs and class members is not restricted to the promise in any express warranties, and they seek all remedies that may be allowed.

**C.    Injury to the Public at Large, the Potential for Future Harm and Need for Injunctive Relief**

81. Defendant's wrongful conduct harms the public-at-large. Namely, by misrepresenting the Products as safe and durable and by failing to disclose that the Products contain a uniform Defect which exposes consumers to the risk of serious injury and fire, the harm extends to all class members and consumers who may purchase the Products.

82. In addition, because Defendant continues to encourage consumers to use the Products as described herein, Defendant's actions pose an ongoing risk to the public.

83. As such, a public injunction is necessary to enjoin Defendant's continued harm of consumers and the public-at-large.

84. Similarly, should Defendant not be enjoined from its unlawful and deceptive conduct, Plaintiffs and class members face the potential for irreparable future harm, including purchasing and/or continuing to use the Products which are not safe or durable.

**D.    Defendant's Actual or Constructive Knowledge of the Defect and Duty to Disclose the Defect**

85. On information and belief, Defendant knew when it first sold the Products to the public that the Products suffered from the Defect. Additionally, Defendant knew that the Defect caused the Products to fail in their regular and intended purpose including that they were unsafe, unstable and unsuitable for consumers' use.

86. As explained above, on information and belief, hundreds of consumers submitted complaints and negative reviews about the Defect both online and directly to Defendant. The volume

of negative reviews raising the exact same issue is unusually large and is indicative of a widespread problem.

87. Not only would the number of complaints over the course of several years demonstrate that Defendant was on notice of the Defect, but the substance of the complaints shows that consumers were surprised, frustrated, and disappointed with unacceptable performance as a result of the Defect.

88. Defendant would have seen the above-described negative reviews and complaints. Online Reputation Management (ORM) is now a standard business practice among major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. ORM involves the monitoring of the reputation of an individual or a brand on the internet, addressing content, which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation. Many companies offer ORM consulting services for businesses.

89. Like most companies, Defendant cares about its reputation and regularly monitors online customer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. Highly negative reviews like those displayed above would be particularly attention-grabbing for Defendant's management because extreme reviews are often the result of material problems—i.e., poor performance and a disconnect between the Products' advertising and user expectations. As such, Defendant's management knew about the above-referenced consumer complaints shortly after each complaint was posted online or made directly to Defendant.

90. Additionally, Defendant is experienced in designing and manufacturing lithium batteries. As an experienced manufacturer, Defendant conducts pre-sale and post-sale safety testing to verify the performance and longevity of the Products. Thus, on information and belief, Defendant discovered the unreasonable risk of fire and sudden failure during testing both before and after publicly releasing the Products for sale, but made a business decision not to take action, including recalling the Products.  Far from it, Defendant continues to advertise the Products as safe and working as intended despite consumer complaints and reviews to the contrary.

91.     Finally, on information and belief, Defendant also would have had notice of the Defect as a result of warranty claims. Before accepting a return or performing a repair, Defendant's policy is to ask each customer for a description of the request and to keep track of the reasons given. Descriptions provided with returns and/or repair requests of the Products therefore would have disclosed the Defect and the disconnect between the Products' advertising and user expectations.

**E.     Tolling and Estoppel of the Statute of Limitations**

92.     Any applicable statutes of limitation have been tolled by the discovery doctrine and Defendant's knowing and active concealment of the defect.

93.     Defendant continuously manufactured, marketed, and sold the defective Products to unsuspecting customers. At all times relevant, it continuously represented that the Products were fit for their intended use, and denied that the Products were inherently defective.

94.     Through no fault or lack of diligence, Plaintiffs and members of the class were deceived regarding the Defect and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.

95.     Plaintiffs and class members had no reasonable way of knowing about the Defect and the Products' omitted limitations.  Indeed, prior to the independent expert investigation published to YouTube in December 2025, no one other than Defendant reasonably could have been aware of the alleged Defect and its widespread impact.

96.     By failing to provide immediate and conspicuous notice of the Products' limitations, denying the Defect, refusing to respond to negative reviews about the Products' performance without publicly acknowledging the Products' limitations, openly denying the Defect, and replacing Products under warranty with the same defective Products, Defendants actively concealed the Defect and the Products' limitations from Plaintiffs and class members.

97.     Plaintiffs and members of the class did not discover and did not know facts that would have caused a reasonable person to suspect the Defect until shortly before commencing this litigation.

98.     Plaintiffs did not learn about the Defect described herein until shortly before commencing this litigation.

99.    On information and belief, Defendant intended their acts to conceal the facts and claims from Plaintiffs and class members. Plaintiffs and class members were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered the Defect.

100.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's active concealment.

## CLASS ALLEGATIONS

101.    Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to California Civil Procedure Code section 382 on behalf of themselves and members of the following proposed nationwide class ("Nationwide Class"):

> During the fullest period allowed by law, all persons who purchased a Product in the United States, within the applicable statute of limitations, for personal use and not resale, until the date notice is disseminated.

102.    Plaintiffs further bring this action individually and as a representative of all those similarly situated, pursuant to California Civil Procedure Code, section 382, and California Civil Code, section 1781, on behalf of themselves and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class"):

> During the fullest period allowed by law, all persons who purchased a Product in the state of California or any state with similar laws,[15] within the applicable statute of limitations, for personal use and not resale, until the date notice is disseminated.

---

[15] While discovery may alter the following, Plaintiffs assert that other states with similar consumer fraud laws under the facts of this case include: Alaska (AS §§ 45.50.471, *et seq*.), Arkansas (Ark. Code §§ 4-88-101, *et seq*.), California (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq*), Delaware (Del. Code tit. 6, §§ 2511, *et seq*.), District of Columbia (D.C. Code §§ 28-3901, *et seq*.), Florida (Fla. Stat. §§ 501.201, *et seq*.), Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq*.), Illinois (815 ICLS §§ 501/1, *et seq*.), Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.), Michigan (Mich. Comp. Law §§ 445.901, *et seq*.), Minnesota (Minn. Stat. §§ 325F.67, *et seq*.), Missouri (Mo. Rev. Stat. §§ 407.010, *et seq*.), New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.), New York (N.Y. Gen. Bus. Law. §§ 349, *et seq*. and §§ 350, *et seq*.), Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq*.), Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq*.), Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.), and Wisconsin (Wis. Stat. §§ 100.18, *et seq*.). *See Langan v. Johnson & Johnson Consumer Companies, Inc*., 897 F.3d 88, 96 (2d Cir. 2018); *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 201, 204 (W.D.N.Y. 2020); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

103.    Plaintiffs further bring this action individually and as a representative of all those similarly situated, pursuant to California Civil Procedure Code section 382, on behalf of themselves and members of the following proposed multi-state implied warranty class ("Multi-State Implied Warranty Non-Privity Class"):

> During the fullest period allowed by law, all persons who purchased a Product in the following states, within the applicable statute of limitations, for personal use and not resale, until the date notice is disseminated: Alaska; Arkansas; California; Colorado; Connecticut; Delaware; District of Columbia; Florida; Hawaii; Indiana; Kansas; Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; North Dakota; Ohio; Oklahoma; Pennsylvania; Rhode Island; South Carolina; South Dakota; Texas; Utah; Vermont; Virginia; West Virginia; Wyoming.

104.    Plaintiffs further bring this action individually and as a representative of all those similarly situated, pursuant to California Civil Procedure Code, section 382, and California Civil Code, section 1781, on behalf of themselves and members of the following class ("California Class"):

> During the fullest period allowed by law, all persons who purchased a Product in the State of California, within the applicable statute of limitations, for personal use and not resale, until the date notice is disseminated.

105.    Unless indicated otherwise, members of the Nationwide Class, Multi-State Consumer Protection Class, Multi-State Implied Warranty Non-Privity Class, and California Class are referred to collectively as the "Class" or "Class Members."

106.    Excluded from the Class are: (a) any officers, directors or employees, or immediate family members of the officers, directors or employees of Defendant or any entity in which Defendant has a controlling interest; (b) any legal counsel or employee of legal counsel for the Defendant; (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members; and (d) any person who has previously settled claims related to the Defect with Defendant.

107.    Plaintiffs reserve the right to amend the definition of the Class and subclasses if discovery or further investigation reveals that the Class should be expanded or otherwise modified

108.    **Numerosity**: Class members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers in the Class who are class members as described above and who Defendant's deceptive and misleading practices damaged.

109. **Commonality**: The questions of law and fact common to the class members which predominate over any questions which may affect individual class members include, but are not limited to:

a. Whether the Products contain the Defect alleged herein;

b. Whether Defendant knew, or should have known, of the Defect;

c. Whether Defendant had a duty to disclose the Defect to consumers;

d. Whether Defendant's conduct alleged herein violated the consumer protection statutes alleged herein;

e. Whether Defendant failed to adequately warn Plaintiffs and class members that the Products contained the Defect and resulting risk of harm;

f. Whether Defendant's representations and omissions were misleading or deceptive;

g. Whether Defendant omitted or failed to disclose material information to Plaintiff and class members regarding the Products;

h. Whether Defendant concealed from and/or failed to disclose to Plaintiff and class members that the Products contain the Defect;

i. Whether Defendant's conduct was unfair or illegal;

j. Whether Plaintiffs and class members suffered economic injury;

k. Whether Defendant's conduct violates public policy;

l. Whether Defendant was unjustly enriched;

m. Whether Plaintiffs and putative members of the Class suffered an ascertainable loss of monies or property or other value as a result of Defendant's acts and omissions of material facts;

n. Whether Defendant was unjustly enriched at the expense of Plaintiff and members of the putative Class in connection with selling the Products with the Defect;

o. Whether Plaintiffs and members of the putative Class are entitled to monetary damages and, if so, the nature of such relief; and

p. Whether Plaintiff and class members are entitled to injunctive, declaratory, or other equitable relief.

110. **Typicality**: Each Plaintiff is a member of the Class. Each Plaintiff's claims are typical

of the claims of each class member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products and were exposed to the same concealed Defect. The law entitles Plaintiffs to relief under the same causes of action as the other class members.

111.    **Adequacy**: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the class members they seek to represent, their consumer fraud claims are common to all members of the Class, and they have a strong interest in vindicating their rights. Further, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

112.    **Predominance**: The common issues of law and fact identified above predominate over any other questions that affect only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that the law requires is a narrow focus on Defendant's deceptive and misleading practices and the unform Defect.

113.    **Injunctive/Declaratory Relief**: Defendant will continue to commit the unlawful practices alleged herein, and Plaintiffs and class members will continue to be deceived by Defendant's marketing of the Products and unknowingly be exposed to the Defect and associated risks thereto. Defendant acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief and corresponding declaratory relief are appropriate respecting the Class as a whole. Injunctive relief, and specifically public injunctive relief, are necessary in this action.

114.    Plaintiffs further seek injunctive and declaratory relief requiring Defendant to cease its unfair, deceptive and unlawful conduct, including a complete recall of the Products and full reimbursement for the Products' full purchase price.

115.    Plaintiffs also seeks a declaration that the Products suffer from the Defect and that all warranties cover the Defect, which existed at the time of sale of the Products to consumers, which was known to Defendant and unknown to consumers.

116.    Class members were harmed and will experience irreparable future harm should

Defendant's conduct not be enjoined because they may continue to use the Products, which still contains the Defect.

117. **Superiority**: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because

a.    The joinder of individual class members is impracticable, cumbersome, unduly burdensome and a waste of judicial and/or litigation resources;

b.    The individual claims of the class members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome and expensive, if not totally impossible, to justify individual actions;

c.    When Defendant's liability is adjudicated, all class members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious and appropriate adjudication and administration of Class claims;

e.    Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among class members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.    Class members' interest in efficient resolution by single class action outweighs their interests in individually controlling the prosecution of separate actions; and

i.    It would be desirable to concentrate in this single venue the litigation of all class members who Defendant's uniform false advertising induced to purchase their Products.

118. **Substantial Similarity**: On information and belief, the Products are substantially similar in all material respects. Specifically, the Products are all 100 amp-hour lithium batteries manufactured by Defendant with substantially similar challenged advertising, including the supposed ability to last for 3000 to 5000 cycles under ordinary use, and all suffer from the same unreasonable safety Defect. Thus, as is relevant to this case, the Products are materially indistinguishable.

119.    **Inadequacy of Legal Remedies:** In the alternative to those claims seeking remedies at law, Plaintiffs and Class members allege that no plain, adequate, and complete remedy exists at law to address Defendant's fraudulent, unlawful, and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief, including because their equitable claims will tried to the Court instead of a jury. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future."). Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded when the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-180 (2000) (restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."). Thus, restitution would allow recovery even when normal considerations associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even when damages are unavailable). Furthermore, the standard and necessary elements for a violation of the UCL "unfair" prong and for quasi-contract/unjust enrichment are different from the standard that governs a legal claim.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
*(By Plaintiffs and the Multi-State Consumer Protection Class)*

120.    Plaintiffs, individually, and on behalf of the Multi-State Consumer Protection Class, realleges paragraphs 1 through 119 as if fully set forth herein.

121.    Plaintiffs and the Multi-State Consumer Protection Class members were injured as a

result of Defendant's violations of the state consumer protection statutes listed in paragraph 102, footnote 15, *supra*. These state consumer protection statutes provide a basis for redress to Plaintiffs and the Multi-State Consumer Protection Class based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

122. Defendant's conduct, as alleged herein, violates the consumer protection laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

123. Defendant's marketing of the Products violates these prohibitions by deceiving consumers into believing that the Products are fit for their intended purpose despite the presence of the Defect.

124. Defendant engaged in fraudulent, unfair and/or deceptive conduct which creates the likelihood of confusion or misunderstanding in violation of applicable law.

125. Specifically, Defendant advertised in a misleading and deceptive manner that the Products are fit for their intended purpose and did not contain the Defect that presents the associated safety risks. Defendant chose to label and market the Products in this way to impact consumer choices, extract price premiums, and gain market dominance, as it is aware that all reasonable consumers who purchase the Products would be impacted by, and would reasonably believe, its false and misleading representations.

126. Defendant intended for Plaintiffs and Multi-State Consumer Protection class members to reasonably rely upon the material misrepresentations concerning the true nature of the Products.

127. Defendant's misrepresentations and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, did cause Plaintiffs and Multi-State Consumer Protection class members to be deceived about the true nature of the Products.

128. Further, despite Defendant's knowledge of material facts concerning the existence of the serious safety risks posed by the Products, Defendant actively concealed the serious safety risks from consumers by failing to disclose the serious safety risks to consumers.

129. As explained above, Defendant knew the Products contained the Defect and posed unreasonable safety risks based upon: (1) Defendant's own internal testing, data and surveys; (2) consumer complaints; and (3) warranty claims.

130.    As explained above, Defendant omitted, concealed and failed to disclose to consumers that the Products pose serious safety risks, including that the Products' design is inherently defective; unreasonably dangerous; not fit to be used for their intended purpose; and is capable of causing serious injury. Rather than disclose this information, Defendant marketed the Products as safe and suitable for their intended purpose.

131.    Rather than disclose this information, Defendant marketed the Products as capable lithium batteries that would last 3000 to 5000 cycles under ordinary use, comply with safety standards, and would provide rechargeable battery power without presenting an unreasonable safety hazard.

132.    The facts concealed and not disclosed by Defendant were material in part because they concerned an essential aspect of the Products, including intended use and safety. Such facts affect the conduct of purchasers, and a reasonable person would have considered those facts to be important in deciding whether to purchase the Products.

133.    Defendant intentionally concealed and/or failed to disclose such material facts for the purpose of inducing consumers, including Plaintiffs and other class members, to purchase the Products.

134.    Had they been aware of the true nature of the Products, Plaintiffs and Multi-State Consumer Protection class members either would have paid less for the Products or would not have made the purchases at all.

135.    As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and Multi-State Consumer Protection class members suffered ascertainable losses.

136.    Pursuant to the aforementioned states' unfair and deceptive trade practices laws, Plaintiffs and Multi-State Consumer Protection class members are entitled to recover compensatory, restitutionary, punitive, treble, and special damages, including reasonable attorneys' fees and costs and injunctive relief.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
*(By Plaintiffs and the Nationwide Class, and alternatively the California Class)*

137.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs

1 through 119 as though set forth fully herein.

138. As explained above, in connection with its sale of the Products, Defendant expressly warranted in its advertising that the Products would last for at least 3,000 to 5,000 cycles, under ordinary and expected use.

139. As explained above, Defendant further warranted that the Products would last for 10 years and safely function as a lithium battery.

140. As explained above, the Products are defectively designed. Additionally, on information and belief, the Products are defectively manufactured. Plaintiffs plead these defects in the alternative.

141. Plaintiffs and class members either: (a) purchased the products directly from Defendant; (b) purchased the Products by and through Defendant's authorized sellers for retail sale to consumers; or (c) were expected to be the third-party beneficiaries of Defendant's contracts with authorized sellers, or eventual purchasers, when bought from a third party.

142. Defendant breached its express warranty by selling lithium batteries that were not free of defects, would not last 3,000 to 5,000 cycles under ordinary use, and were unsuitable for use as lithium batteries.

143. The Products that Plaintiff and each class member purchased were subject to the Defect and caused each of them injury because they would not have purchased the Products, or would have paid less for the Products, had they known of the Defect.

144. To the extent Defendant repaired or replaced any Products under warranty, the remedy failed of its essential purpose because the Defect remained. Defendant simply replaced one defective product with another.

145. Plaintiffs mailed written notice of this claim to Defendant on February 4, 2026 and delivered February 9, 2026. Upon information and belief, Defendant also received notice and has known of the Defect through customer warranty claims, consumers reporting problems with the Product, customer complaints, and its own internal and external testing.

146. As a result of Defendant's breach of its express warranty, Plaintiffs and class members suffered damages.

## COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
*(By Plaintiffs and the Nationwide Class, and alternatively the Multi-State Implied Warranty Non-Privity Class and the California Class)*

147.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 119 as though set forth fully herein.

148.    Plaintiffs' the California Class's implied warranty claims are brought under Cal. Commercial Code § 2314 (and, alternatively, under the Song-Beverly Act pursuant to Count IV). The claims of the Nationwide Class are brought under the Uniform Commercial Code as enacted in their respective home states. The claims of the Multi-State Implied Warranty Non-Privity Class are brought under the laws of the following states as codified below:

     a.   Alaska Stat. §§ 45.02.314, et seq.;

     b.   Ark. Code Ann. §§ 4-2-314, et seq.;

     c.   Colo. Rev. Stat. Ann. §§ 4-2-314, et seq.;

     d.   Conn. Gen. Stat. §§ 42a-2-314, et seq.;

     e.   Del. Code Ann. Tit. 6, §§ 2-314, et seq.;

     f.   D.C. Code §§ 28:2-314, et seq.;

     g.   Haw. Rev. Stat. §§ 490:2-314, et seq.;

     h.   Ind. Code §§ 26-1-2-314, et seq.;

     i.   Kan. Stat. Ann. §§ 84-2-314, et seq.;

     j.   La. Civ. Code Ann. Art. 2520, et seq.;

     k.   Md. Code Ann., Com. Law §§ 2-314, et seq.;

     l.   Me. Rev. Stat. Ann. Tit. 11, §§ 2-314, et seq.;

     m.   Mass. Gen. Laws ch. 106, §§ 2-314, et seq.;

     n.   Mich. Comp. Laws Ann. §§ 440.2314, et seq.;

     o.   Minn. Stat. §§ 336.2-314, et seq.;

     p.   Miss. Code Ann. §§ 75-2-314, et seq.;

     q.   Mo. Rev. Stat. §§ 400.2-314, et seq.;

     r.   Mont. Code Ann. §§ 30-2-314, et seq.;

s.   Neb. Rev. Stat. Ann. §§ 2-314, et seq.;

t.   Nev. Rev. Stat. §§ 104.2314, et seq.;

u.   N.H. Rev. Stat. Ann. §§ 382-A:2-314, et seq.;

v.   N.J. Stat. Ann. §§ 12A:2-314, et seq.;

w.   N.M. Stat. Ann. §§ 55-2-314, et seq.

x.   N.D. Cent. Code §§ 41-02-31, et seq.;

y.   Ohio Rev. Code Ann. §§ 1302.27, et seq.;

z.   Okla. Stat. Tit. 12A, §§ 2-314, et seq.;

aa.  13 Pa. Stat. Ann. §§ 2314, et seq.;

bb.  R.I. Gen. Laws §§ 6A-2-314, et seq.;

cc.  S.C. Code Ann. §§ 36-2-314, et seq.;

dd.  S.D. Codified Laws §§ 57A-2-314, et seq.;

ee.  Tex. Bus. & Com. Code Ann. §§ 2.314, et seq.;

ff.  Utah Code Ann. §§ 70A-2-314, et seq.;

gg.  Va. Code Ann. §§ 8.2-314, et seq.;

hh.  Vt. Stat. Ann. Tit. 9A, §§ 2-314, et seq.;

ii.  W. Va. Code §§ 46-2-314, et seq.; and

jj.  Wyo. Stat. Ann. §§ 34.1-2-314, et seq.

149.   Defendant defectively manufactured the Products purchased by Plaintiffs and class members, and those Products posed a serious, immediate, and unreasonable safety risk to consumers and the public.

150.   All Products sold by Defendant left Defendant's facilities and control with the Defect.

151.   The Defect places Plaintiffs and class members at serious safety and property damage risk upon using the Products in their homes, vehicles, and other heavy machinery.

152.   As explained above, in connection with its sale of the Products, Defendant warranted in its advertising that the Products would last for at least 3,000 to 5,000 cycles, under ordinary and expected use.

153.   As explained above, Defendant further warranted that the Products would last for 10

years and safely function as a lithium battery.

154.    The law requires manufacturers and sellers to ensure that products: (a) are merchantable and reasonably fit for the ordinary purposes for which ordinary consumers use them; (b) are acceptable in trade for the product description; and (c) conform to advertising and labeling. This implied warranty of merchantability is part of the basis of the bargain between Defendant and purchasers, including Plaintiffs and the class members.

155.    Defendant breached the implied warranty of merchantability because the Products: (a) are defective and pose a serious safety risk; (b) were not fit for the ordinary purposes for which they were used; (c) would not pass without objection under industry standards; and (d) failed to conform to the advertised standards of performance.

156.    The Defect is substantially certain to manifest during the reasonable expected life of the Products.

157.    As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs and class members bought the Products without knowledge of the Defect or the serious safety risk.

158.    As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs and class members purchased unsafe and defective Products that were not fit for their intended purpose of being reasonably safe to use as lithium batteries, without disclosing that they had a critical safety-related Defect.

159.    Plaintiffs provided written notice of this claim to Defendant on February 4, 2026 and delivered February 9, 2026. Upon information and belief, Defendant also received notice and has known of the Defect through customer warranty claims, consumers reporting problems with the Product, customer complaints, and its own internal and external testing.

160.    Despite having notice and knowledge of the Defect, Defendant failed to provide: (a) Defect-free lithium batteries to Plaintiffs and class members; (b) adequate replacement of the defective Products; and (c) any form of compensation for economic damages that resulted from the Defect.

161.    Any attempt by Defendant to disclaim the implied warranty was improper, insufficient, and of no effect. Any attempt by Defendant to limit or disclaim the implied warranties in a manner

that would exclude coverage of the Defect also is procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302, as adopted by the states listed in this Count. Defendant knew and should have known about the Defect prior to selling the Products while continuing to market the Products as safe and reliable, had unequal bargaining power, and misrepresented the Products' reliability, and any temporal or remedial limitations or disclaimers unreasonably favor Defendant and fail Plaintiffs' and class members' reasonable expectations for product performance.

162.    As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs and class members suffered damages.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, SONG-BEVERLY CONSUMER WARRANTY ACT**
**Cal. Civ. Code §§ 1791.1 & 1792**
*(By Plaintiffs and the California Class)*

163.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 119 as though set forth fully herein.

164.    Plaintiffs and California Class members who purchased the Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

165.    The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

166.    Defendant is a "manufacturer" of the Products within the meaning of Cal. Civ. Code § 1791(j).

167.    Defendant impliedly warranted to Plaintiffs and the other California Class Members that the Products were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1 & 1792.

168.    However, the Products do not have the quality that a reasonable purchaser would expect.

169.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: "(1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; … and (4) conform to the promises or affirmations of fact made on the container or label."

170.    Because of the Defect described above, the Products would not pass without objection in the trade. Rather, the Products pose an unreasonable safety hazard and should not be used under ordinary and expected conditions.

171.    Because of the Defect, the Products do not conform to its advertising, which represents the Products will last for at least 3,000 to 5,000 cycles and can be used as a lithium battery in RVs, homes, vessels, and other common uses.

172.    Because of the Defect, the Products are not fit for the ordinary purpose they are used and would not pass without objection in the trade.

173.    The Defect in the Products is latent.  Though the Products appear operable when new, the Defect existed at the time of sale and throughout the one-year period under the Song-Beverly Act. Accordingly, any subsequent discovery of the defect by California Class members beyond that time does not bar an implied warranty claim under the Song-Beverly Act.

174.    Further, despite due diligence, Plaintiffs and California Class Members could not have discovered the Defect before the manifestation of its symptoms and retaining an expert to disassemble the Products. Those California Class members whose claims would have otherwise expired allege that the discovery rule and doctrine of fraudulent concealment tolls them.

175.    Defendant breached the implied warranty of merchantability by manufacturing and selling the Products. Plaintiffs and the other California Class Members did not receive the benefit of their bargain and Defendant caused Products to depreciate in value.

176.    As a direct and proximate result of each Defendant's breach of the implied warranty of merchantability, Plaintiffs and the other California Class members received goods whose defective condition substantially impairs their value to Plaintiffs and California Class members. Plaintiffs and California Class Members have been damaged as a result of the diminished value of the Products.

177.    Plaintiffs and California Class Members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Products or the overpayment or diminution in value of their Products.

178.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**COUNT V**
**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA")**
**Violation of Cal. Civ. Code §§ 1750, et seq**
*(By Plaintiffs and the California Class)*

179.    Plaintiffs, individually, and on behalf of the California Class, reallege paragraphs 1 through 119 as if fully set forth herein.

180.    Plaintiffs bring this Count on behalf of themselves and the California Class.

181.    This claim is brought under the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*

182.    Plaintiffs and California Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d). Defendant's sale of the Products constitutes "transactions," and the batteries are "goods," within §§ 1761(a) and (e).

183.    Defendant violated the CLRA by engaging in unfair and deceptive practices proscribed by § 1770(a), including but not limited to the following:

   a.  Representing that the Products have characteristics or uses they do not have (§ 1770(a)(5));

   b.  Representing that the Products are of a particular standard or quality when they are not (§1770(a)(7));

   c.  Advertising goods with the intent not to sell them as advertised (§ 1770(a)(9));

   d.  Misrepresenting the rights and remedies available to consumers (§ 1770(a)(14)); and

   e.  Representing that the Products were supplied in accordance with prior representations when they were not (§ 1770(a)(16)).

184.    As detailed above, Defendant deceived consumers by misrepresenting and omitting material facts about the Products' performance and the Defect, including the serious safety and fire hazard.

185.    As detailed above, Defendant represented in its advertising that the Products would last for at least 3,000 to 5,000 cycles under ordinary and expected use, comply with safety standards, and would provide rechargeable battery power without presenting an unreasonable safety hazard.

Defendant further represented that the Products would last for 10 years.

186.   Defendant's unfair or deceptive acts or practices, including its misrepresentations and omissions of material facts in the manufacturing, marketing, and selling of the defective Products, and the decision to deny any adequate recall, had a tendency or capacity to mislead and create a false impression in consumers. They were likely to and did in fact deceive reasonable consumers, including Plaintiffs and California Class Members, about the true safety, quality, and value of the Products.

187.   As detailed above, despite Defendant's knowledge of material facts concerning the existence of the serious safety risks posed by the Products, Defendant actively concealed the serious safety risks and the Defect from consumers by failing to disclose the serious safety risks or Defect to consumers.

188.   As detailed above, Defendant knew that the Products contained the Defect and posed serious safety risks based upon: (1) Defendant's own internal testing, data and surveys; (2) consumer complaints; and (3) warranty claims.

189.   As detailed above, Defendant omitted material facts that would have been important to any reasonable consumer, including that the Products were inherently defective, unreasonably dangerous, and not suitable for their intended use. Instead, Defendant marketed the Products as premium goods, compliant with safety standards, and safe for use as a battery.

190.   The facts concealed and/or not disclosed by Defendant to consumers, including Plaintiffs and other Class Members, were material, in part, because they concerned an essential aspect of the Products: intended use and safety. Such facts affect the conduct of purchasers, and a reasonable person would have considered those facts to be important in deciding whether to purchase the Products.

191.   Plaintiffs and California Class Members suffered injury in fact and actual damages because they purchased the Products without knowledge of the Defect and would not have purchased—or would have paid substantially less—had the truth been disclosed.

192.   On information and belief, Defendant's actions were willful, wanton, and fraudulent.

193.   On information and belief, Defendant's officers, directors, or managing agents authorized the use of unfair or deceptive acts or practices.

194. Defendant's violations present an ongoing risk to Plaintiffs, the California Class and the general public, warranting injunctive relief.

195. Accordingly, pursuant to Civil Code § 1780(a)(2), Plaintiffs, on behalf of themselves and all other members of the Class, seek injunctive relief, including an order to enjoin Defendant from continuing its deceptive advertising and sale practices.

196. Plaintiffs mailed notice to Defendant pursuant to Cal. Civ. Code § 1782(a) on February 4, 2026. Upon expiration of the 30-day notice period, Plaintiffs will amend this Complaint to seek damages. At this time, Plaintiffs only seek injunctive relief under the CLRA.

**COUNT VI**
**CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Violation of Cal. Bus. & Prof. Code §§ 17200, et seq.**
***(By Plaintiffs and the California Class)***

197. Plaintiffs individually, and on behalf of the California Class, reallege paragraphs 1 through 119 as if fully set forth herein.

198. Defendant is a "person" withing the meaning of Cal. Bus. & Prof. Code § 17201.

199. As explained above, Plaintiffs and California Class members suffered economic injury because they purchased Products that were misrepresented and sold without disclosure of the Defect. Had they known the truth, they would not have purchased the Products or would have paid less.

200. Defendant's conduct constitutes unlawful, unfair, and fraudulent business practices under the UCL. Defendant violated multiple independent statutes and public policies, including the CLRA, the Song-Beverly Consumer Warranty Act, and California's common law prohibitions on fraud and concealment.

201. Defendant's actions and practices constitute "unfair" business practices in violation of the UCL, because, among other things, they are immoral, unethical, oppressive, unconscionable, unscrupulous, or substantially injurious to consumers, and/or because any utility of such practices is outweighed by the harm caused to consumers.

202. As detailed above, Defendant's conduct was "fraudulent" because it misled consumers into believing the Products were safe, functional, and suitable for their intended use when Defendant knew or should have known the Products were defective and dangerous. Further, given the Defect,

Defendant falsely represented that the Products' expected life was 3,000 to 5,000 cycles.

203.    Defendant had a duty to disclose these material facts because the batteries were unsafe and substantially certain to fail.

204.    Defendant's misrepresentations and omissions were likely to deceive reasonable consumers and did deceive Plaintiffs and California Class members.

205.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiffs and California Class members suffered injury in fact and lost money by purchasing defective Products they otherwise would not have purchased or for which they would have paid materially less.

206.    Plaintiffs and the California Class seek equitable relief under § 17203, including restitution and injunctive relief prohibiting Defendant from continuing its unlawful practices.

207.    Restitution is appropriate because Defendant received money from Plaintiffs and the California Class through practices that violated the UCL, and equity requires returning those ill-gotten gains. The claims for equitable relief are brought in the alternative, should Plaintiffs not have an adequate remedy at law.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
**CAL. BUS. & PROF. CODE §§ 17500 ("FAL")**
*(By Plaintiffs and the California Class)*

208.    Plaintiffs individually, and on behalf of the California Class, reallege paragraphs 1 through 119 as if fully set forth herein.

209.    Plaintiffs bring this claim on behalf of the California Class (the "Class" for purposes of this Count).

210.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

211.    It is also unlawful under the FAL to disseminate statements concerning property or

services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

212.    As detailed above, the advertisements, marketing, acts, and practices of Defendant relating to the performance and safety of the Products misled consumers acting reasonably.

213.    Plaintiffs and Class members suffered injuries in fact as a result of Defendant's actions as set forth above because they purchased Defendant's Products in reliance on Defendant's false and misleading claims concerning, among other things, the Product's safety, quality, and longevity.

214.    Defendant's business practices as alleged above constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant advertised and marketed the Products in a manner that is untrue and misleading, a fact that Defendant knew or reasonably should have known. Defendant also omitted material information from its advertising and marketing regarding the safety and suitability of the Products for use by consumers.

215.    Defendant profited from its sale of the falsely and deceptively advertised and labeled Products.

216.    As a result, Plaintiffs and the Class are entitled to equitable relief, including restitution and injunctive relief.

217.    Plaintiffs and the Class were damaged because they would not have purchased the Products, or would have paid less for them, had they known the true facts regarding its safety and defective condition.

## COUNT VIII
### UNJUST ENRICHMENT/QUASI-CONTRACT
*(By Plaintiffs and the California Class)*

218.    Plaintiffs individually, and on behalf of the California Class, reallege paragraphs 1 through 119 as if fully set forth herein.

219.    Plaintiffs plead this claim under California law and in the alternative to their remaining claims.

220.    California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d

753, 756 (9th Cir. 2015).

221. California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020).

222. California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

223. Under California law, a stake in unjustly earned profits exists regardless of the plaintiff's actual loss.

224. By its wrongful acts and omissions, Defendant was unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class and/or while Plaintiffs and the Class were unjustly deprived.

225. On behalf of the California Class, Plaintiffs seek restitution from Defendant and an order disgorging all payments and profits obtained by Defendant from Plaintiffs and the California Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered, against Defendant, by an order that does the following:

A.    certifies the proposed Classes

B.    designates Plaintiffs as the class representatives, designates the undersigned as class counsel and requires Defendant to bear the costs of class notice;

C.    enjoins Defendant from selling the Products until either: (a) they can be safely used as lithium batteries that meet industry standards; or (b) full disclosure of the failure to meet industry standards appears on all packaging;

D.    requires Defendant to engage in (a) a corrective advertising campaign; and (b) any further necessary affirmative injunctive relief, such as recalling the existing Products;

E.    requires Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be: (a) an unlawful, unfair or fraudulent business

act or practice; (b) untrue or misleading advertising; or (c) a violation of law, plus pre-judgment and post-judgement interest thereon;

F.      requires Defendant to disgorge or return all moneys, revenues and profits obtained by means of any wrongful or unlawful act or practice;

G.      requires Defendant to pay all actual and statutory damages, permitted under the counts alleged herein, in an amount to be determined by this Court;

H.      requires Defendant to pay punitive damages on any count so allowable;

I.      awards attorneys' fees and costs to Plaintiffs and the Class;

J.      pre- and post-judgment interest; and

K.      provides for all other just, proper relief.

## **JURY TRIAL**

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: February 13, 2026                    Respectfully submitted,

                                            */s/ Alexander E. Wolf*
                                            Alexander E. Wolf (SBN 299775)
                                            awolf@milberg.com
                                            **MILBERG, PLLC**
                                            280 South Beverly Drive, PH
                                            Beverly Hills, CA 90212
                                            Tel: (872) 365-7060

                                            Trenton R. Kashima (SBN 291405)
                                            **BRYSON HARRIS SUCIU
                                            & DEMAY PLLC**
                                            19800 MacArthur Blvd., Suite 270
                                            Irvine, CA 92612
                                            (212) 946-9389
                                            tkashima@brysonpllc.com

                                            *Attorneys for Plaintiffs and the Class*